UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| OTIS ELEVATOR COMPANY )<br>    Plaintiff, )<br>)<br>v. )<br>)<br>LOCAL 4, INTERNATIONAL UNION )<br>OF ELEVATOR CONSTRUCTORS; )<br>MICHAEL LANGER, INDIVIDUALLY, )<br>and as BUSINESS MANAGER; )<br>KEVIN McGETTIGAN, INDIVIDUALLY, )<br>and as BUSINESS REPRESENTATIVE; )<br>STEVE MORSE, INDIVIDUALLY, )<br>and as BUSINESS REPRESENTATIVE; )<br>and all others conspiring, acting in concert )<br>or otherwise participating with them or )<br>acting in their aid or behalf, )<br>)<br>    Defendants. ) | Docket No.<br><br>**04-10966 JLT**<br><br>May 14, 2004 | |

## DECLARATION OF JIM CUMMINGS

Jim Cummings, being duly sworn, deposes and says as follows:

1. I am employed by Otis Elevator Company ("Otis"). I am the Otis Construction Superintendent for a project currently underway at Bentley College (the "Bentley job"), which involves the installation of two, four stop hydraulic elevators.

2. Otis is engaged in the business of selling, installing, and servicing elevators and escalators throughout the United States, including Massachusetts. In cases of new construction, such as are at issue here, Otis contracts with the general construction contractor or building owner to provide the material and labor and complete installation services for elevators.

3. Otis has a collective-bargaining agreement with the International Union of Elevator Constructors ("IUEC") for and on behalf of its local unions, including IUEC Local 4,

("Local 4"), which represents Otis' employees in and around Boston, Massachusetts and in Maine. For a further explanation of the parties' collective bargaining agreement (the "Otis Agreement"), and its relationship to this dispute, I refer to the declaration of David Powilatis.

4. As Construction Manager for Otis, I have overall responsibility for seeing that Otis satisfactorily completes its agreement to install elevators at the Bentley job site.

5. On the Bentley job, Otis has a construction agreement with Corjen Construction ("Corjen"), a valued Otis customer, to install two, four-story hydraulic elevators. This project is time-sensitive and Otis' current and future relationship with Corjen may be severely damaged if the elevator installation is not completed on a timely basis. One elevator has been substantially completed.

6. A dispute has arisen between Otis and Local 4 involving the use of installation nuts ("nut-serts") on elevator doors. This dispute has resulted in a work stoppage by Otis' employees at the Bentley job, and elsewhere. Specifically, the Union has instructed Otis' employees not to install any elevator doors at the Bentley job because of the dispute over the use of nut-serts.

7. On Thursday, May 13, 2004, at approximately 11:00 a.m. at my office in Needham, Massachusetts, I instructed Mechanic Shelby Lunceford and Apprentice Mike Thompkins to proceed to the Bentley job site and install elevator doors. Mechanic Lunceford and Apprentice Thompkins refused to do so and informed me that Local 4 Business Representative Kevin McGettigan had instructed them not to hang the elevator doors at issue. Upon hearing this, I immediately called Local 4 Business Representative McGettigan to confirm whether this instruction had in fact been given, and Local 4 Business Representative McGettigan admitted that he had indeed directed Mechanic Lunceford and Apprentice Thompkins to refuse

to hang the doors. After finishing my conversation with Local 4 Business Representative McGettigan, I repeated to Mechanic Lunceford and Apprentice Thompkins that hanging the doors was the next step in the installation process and therefore the only work I had for them. Each employee said he was refusing to hang the doors "per the Union's direction." After Mechanic Lunceford and Apprentice Thompkins told me they refused to install the hoistway doors, they left my office.

8. Local 4's directive has brought the Bentley job to a complete halt. The installation of elevators at the Bentley job cannot go forward if Local 4 continues to instruct Otis' employees not to install the doors.

9. Otis' relationship with Corjen is threatened and may be severely damaged if the work stoppage continues. Otis currently has other construction contracts with Corjen and would like to do elevator work for them in the future.

10. In situations where Otis needs one or more additional qualified Mechanics but no Mechanics are available, the Otis Agreement provides that an Apprentice possessing appropriate qualifications may work as a "Temporary Mechanic" ("TM"). Otis frequently exercises its right under the Otis Agreement to employ TMs in the Boston area. As of May 14, 2004 Otis was employing eight TMs in the Boston area, six of which report to me.

11. Under Article X, par. 4 of the Otis Agreement, "the withdrawal of or failure to issue a Temporary Mechanic's card will not be used by the Union to advance its position with respect to a dispute unrelated to [Article X, par. 4]."

12. On or about May 13, 2004, about 90 minutes after my instructions to Lunceford and Thompkins to install the elevator doors at the Bentley job, and their refusal to do so, Otis TMs began calling me and reporting that Local 4 contacted them and stated that that they were

3

set back or "knocked down" to Apprentice status (i.e., prohibited from working as TMs) because Otis had allegedly "laid off" Mechanic Lunceford. As discussed above, Otis did not lay off Mechanic Lunceford. Otis has available work for Mechanic Lunceford at the Bentley job. The Union, however, has instructed Mechanic Lunceford to refuse to perform this work.

13. A total of five of the six TMs who report to me called and reported having been instructed by Local 4 that they could not work as TMs. The sixth TM who reports to me is out on a medical leave until Monday, May 17, 2004. The two Otis TMs who report to Otis Modernization Supervisor Eric Morse have also reported being told by Local 4 that they are prohibited from working as TMs.

14. The Union's interference with Otis' employment of TMs has similarly impacted Otis' ability to timely complete other contracts to install elevators in and around Boston. The Union's refusal to allow Otis' TMs to work has threatened and will severely damage Otis' customer relationships with several of its largest clients in Boston if the work stoppage continues. Specifically, Otis has a subcontract with John Moriarty Associates ("J.M.A.") to install its newest generation elevator, the GEN2, at Boston University. TM Nancy McMahon is responsible for that installation. There currently is a deadline of May 26, 2004 to have a test car operating. This deadline cannot be met if Nancy McMahon is not allowed to continue working as a TM. Otis has at least five other constructions projects with J.M.A. at this time.

15. Otis has another contract with Clark/Suffolk Construction to install an elevator for Manulife in South Boston. Clark/Suffolk Construction is a joint venture between Clark Construction and Suffolk Construction. Suffolk Construction is the biggest general contracting company in Boston and is Otis' largest customer for construction work in the Boston area. TM Mark Marston is the foreman on that project and his continued presence is essential to

completion of that installation. Otis' work at this job is already behind schedule and Local 4's interference with Otis' right to employ TMs will further exacerbate delay at the site.

16. Otis also has a contract with Beacon Skanska Construction to install 18 elevators at Logan Airport at the Delta Airlines Terminal. TMs Mike McBrien and Kevin Lilley are both necessary to complete timely the Delta Airlines Terminal installation. If Local 4 continues to refuse to allow Otis' employees to work as TMs, Otis will be unable to fulfill its contractual obligations on each of these projects in a timely manner.

17. The Union's interference with Otis' employment of TMs is a direct violation of the Otis Agreement, as the Union is attempting to advance its position with respect to the use of nut-serts by knocking down Otis' TMs.

18. At approximately 3:00 p.m. on May 13, 2004, I had another ~~telephone~~ conversation with Local 4 Business Representative McGettigan regarding this dispute. Local 4 Business Representative McGettigan asked me if I intended Friday morning to direct Mechanic Lunceford and Apprentice Thompkins to install the elevator doors at the Bentley job. I replied "Yes, that is the work I have available for them." Local 4 Business Representative McGettigan responded that directing this work not only would continue to impact the status of TMs that had been "knocked down earlier today," but that anyone "below Thompkins," including probationary Apprentices, transient Helpers, transient Apprentices, first year Apprentices and second year Apprentices, also "could not work" because Otis had "laid off" Apprentice Thompkins. I repeated to Business Representative McGettigan that, Otis did not lay off Apprentice Thompkins. Otis has available work for Apprentice Thompkins at the Bentley job. The Union, however, has instructed Apprentice Thompkins to refuse to perform this work.

19. I personally told every Otis employee with whom I spoke after Local 4's work stoppage began at approximately 11:00 a.m. on May 13, 2004 that Otis has not laid off any employees in Local 4's jurisdiction.

20. Local 4's instructions to Otis Apprentices and Helpers to refuse to work is interfering with Otis' operations at job sites including Boston Opera House, where Otis is under pressure to complete its work by June 10, 2004; at the Delta Airlines Terminal; at the Conant Village job site; and at the Charles River Plaza and Mitre Corp. job sites – two sites where Otis also has contracts with J.M.A.

21. At approximately 4:30 p.m. on May 13, 2004, I called Mechanic Lunceford to inform him that I intended to direct him to work at the Bentley job the next day installing elevator doors. I asked Mechanic Lunceford if he would perform the work. Mechanic Lunceford responded that he would do as the Union instructed and refuse to do the work.

22. At approximately 4:30 p.m. on May 13th, I sent a facsimile to Business Representative McGettigan restating that Otis had not "laid off" Mechanic Lunceford or Helper Thompkins, and specifically told him that Otis had work available for both employees at the Bentley job site. To date, neither Business Representative McGettigan, nor any other representative of Local 4, has responded to my letter.

23. As threatened by Business Representative McGettigan, beginning at approximately 7:00 p.m. on May 13, 2004, I began receiving calls from my employees indicating that they could not work "per Union instruction" because "Otis had laid off Mechanic Lunceford and Helper Thompkins." Specifically, Helper Eric Hubbard called me and stated that Local 4 Business Representative Steve Morse had called him and told him not to report to work on Friday because "Otis had laid off third year Apprentice Thompkins." I told Helper Hubbard that

6

Otis did not lay off Helper Thompkins and that we had available work for him, which he refused to do. Helper Hubbard stated that he was taking his direction from the Union and that he would not be working on Friday.

24. I had a nearly identical telephone calls on May 13th with Helper Bob Finnell, and on Friday May 14th, with Helpers Kirk Piepenbrink, Ben Moyer, Ralph Maas, Chris Martin and Warren Fitzpatrick. Each stated that they would not be working today because Local 4 Business Representative Steve Morse had called and told them not to report to work because "Otis had laid off third year Apprentice Thompkins." I told each employee that Otis did not lay off Helper Thompkins and that we had available work for him, which he had refused to do.

25. At approximately 7:00 a.m. on Friday May 14, 2004, TM Mike McBrien called me and said that Local 4 had indeed "pulled" the TM cards for himself, Kevin Lilley, Mark Marston, Nancy McMahon, Ryan McWhinnie and Tony Obert, because Local 4 claimed Otis had laid off Mechanic Lunsford. TM McBrien further stated that Local 4 had threatened them with discipline and fines if they ignored the Union's directive by continuing to work as TMs.

26. On Friday May 14, 2004, two transient Mechanics from Local 91 in Connecticut, who were working under my supervision in Boston, also refused to work because of Local 4's directive.

27. Because of the Union's unlawful work stoppage, there are approximately six TMs, two transient Mechanics and ten Helpers directly under my supervision who are refusing to work. The Union's unlawful refusal to work has significantly impacted Otis' ability to fulfill its contractual obligations to construct elevators throughout Boston.

28. Otis has a reputation with its customers for providing first-rate service. The Union's unlawful work stoppage and withdrawal of the TMs has jeopardized Otis' goodwill and

reputation with its customers and there is no method for calculating the damage cased by the Union's work stoppage.

SWORN to under the pains and penalties of perjury.

Dated: May 14, 2004

Jim Cummings

BRT.52621.1